UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | Docket No. 23 CR 00002-001 (PAE) |
| - against - | |
| COOPER MORGENTHAU, | |
| Defendant. | |

**DEFENDANT'S SENTENCING MEMORANDUM**

GLENN AGRE BERGMAN & FUENTES LLP
1185 Avenue of the Americas, 22nd Fl
New York, New York 10036
(212) 970-1600

*Counsel for Cooper Morgenthau*

# TABLE OF CONTENTS

Page(s)

INDEX OF EXHIBITS.................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................ iii

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.    FACTS ..................................................................................................................... 3

    A.    Personal History and Education............................................................... 3

    B.    Business History ....................................................................................... 4

    C.    Family and Friendships............................................................................ 5

    D.    Mental Health, Substance Abuse and Gambling ..................................... 6

    E.    The Offense.............................................................................................. 7

    F.    Self-Report and Full Cooperation ........................................................... 9

III.    SENTENCING ....................................................................................................... 10

    A.    Guidelines Calculation ........................................................................... 10

    B.    Cooper Morgenthau Should Receive a Non-Custodial Sentence ............ 11

        1.    Nature and Circumstances of the Offence and History and Characteristics of the Defendant.................................................... 12

        2.    Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Adequately Deter Criminal Conduct.................................... 14

        3.    Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant.................................................... 16

        4.    Available Sentences ..................................................................... 16

        5.    Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct ................... 16

        6.    Need to Provide Just Restitution.................................................. 17

IV.    CONCLUSION....................................................................................................... 18

# INDEX OF EXHIBITS

Exhibit(s)

Letter from Anetta Morgenthau ...................................................................................................A

Letter from Darlene Smith ........................................................................................................B

Letter from Nicole Lindstedt ....................................................................................................C

Letter from Rev. Jeff Grant.......................................................................................................D

# TABLE OF AUTHORITIES

Page(s)

Cases

*Gall v. United States*,
552 U.S. 38 (2007) ............................................................................... 11, 12, 15, 16

*Nelson v. United States,*
555 U.S. 350 .......................................................................................... 11

*SEC v. Cooper J. Morgenthau,*
No. 23-CV-00022, Dkt. No. 4 (S.D.N.Y. 2023) .............................................. 14

*United States v. Abiodun,*
536 F.3d 162 (2d Cir. 2008) .................................................................... 11

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...................................................... 11, 18

*United States v. Anderson,*
533 F.3d 623 (8th Cir. 2008) ................................................................... 14

*United States v. Booker,*
543 U.S. 1097 (2005) ............................................................................. 11

*United States v. Howe,*
543 F.3d 128 (3d Cir. 2008) ................................................................... 17

*United States v. Jennings,*
743 F. App'x 474 (2d Cir. 2018) .............................................................. 12

*United States v. Johnson,*
No. 16-CR-457-1, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ................ 11

*United States v. Kononchuk,*
485 F.3d 199 (3d Cir. 2007) ................................................................... 12

*United States v. Lauersen,*
362 F.2d 160 (2d Cir. 2004) ................................................................... 11

*United States v. Oldani,*
No. 09-CR-00010, 2009 WL 1770116 (S.D.W. Va. June 16, 2009) ............ 16

*United States v. Parris,*
573 F. Supp. 2d 744 (E.D.N.Y. 2008) .................................................... 12, 14

*United States v. Redemann,*
295 F. Supp. 2d 887 (E.D. Wis. 2003) .................................................... 15

*United States v. Schuster,*
No. 01-CR-67, 2002 WL 31098493 (S.D.N.Y. 2002) .............................. 17

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009)..................................................................... 14

*United States v. Warner*,
    No. 13-CR-731 (N.D. Ill. 2014), *aff'd*, 792 F.3d 847 (7th Cir. 2015) ..................................... 17


Statutes and Guidelines

18 U.S.C. § 1343 ................................................................................... 1

18 U.S.C. § 3553(a) ......................................................................... 12, 18

18 U.S.C. § 3553(a)(7) ......................................................................... 18

18 U.S.C. § 3559(a) ............................................................................. 16

18 U.S.C. § 3561(a) ............................................................................. 16

U.S.S.G. § 2B1.1, Application Note 21(C)................................................. 11

U.S.S.G. § 3E1.1(a), (b)....................................................................... 10

This memorandum is respectfully submitted on behalf of Cooper Morgenthau in connection with his sentencing scheduled for April 27, 2023 at 3:00 p.m.

## I. PRELIMINARY STATEMENT

Cooper, who is 36, pled guilty pursuant to a plea agreement to wire fraud in violation of 18 U.S.C. § 1343. That charge relates to his conduct as a chief financial officer of two SPAC entities from June 2021 to August 2022, during which time he took and lost millions of dollars that belonged to the companies and their investors. The offense in this case was not one of malevolence or even avarice. He did not seek to enrich himself at the expense of others. He did not take the money for luxury or even personal gain. Nor did he intend the harm his conduct wrought.

He initially took the first amount of company funds, about $20,000, as an advance against his salary (albeit unauthorized and undisclosed) to cover some of his expenses for his then-upcoming wedding celebration in the summer of 2021. To buy time to replace the funds, he compounded his offense with lies and false accounting. He then illicitly transferred more company funds to his day-trading account to buy and trade securities in an attempt to use the (hoped-for) trading gains to replace all of the company money he took. That led to a spiral of losses.

In every respect connected to these initial defalcations, he betrayed the trust of his office and he fundamentally betrayed his business colleagues as well as family and friends who invested with these companies at his urging. Under stress and desperation to find a quick way to repay the funds before detection, he made matters much worse. Over a period of months, he took more and more money from the companies and investors under false pretenses intending to invest and day trade – including trading in cryptocurrencies – to use the anticipated trading gains to replace the funds taken from the companies. That panicked, unthinking response, no matter how well

intentioned, compounded his offense many times over – leading to the loss of millions and landing him before this Court.

He has never before done anything like this. Despite his young age, he has been remarkably successful in his career. After starting as a financial analyst with major financial institutions, he developed a largely self-devised career conceiving, arranging for and building successful companies, using creativity, ingenuity and his extensive knowledge of and experience in finance and business. That early success came from his selfless dedication to work on high-pressure multi-billion dollar deals for mentors in the rarefied world of high finance and multinational business transactions. While well compensated, he never received the type of financial rewards that others exacted from these high-profile billion-dollar deals.

The pressure and stress of working in this field taxed Cooper and exacerbated health and alcohol issues that plagued him since he was a child. Because of his dedication to his work, he neglected his personal relationships and he did not take the time to care for his own health properly, including his mental and emotional health.

In 2021, as the country (and world) revived from the 2020 pandemic lockdown, Cooper was juggling his time-demanding work with his new commitment to make room in his life for his personal relationships, including most importantly with his spouse, Anetta Morgenthau, whom he had married at City Hall in 2019. By the summer of 2021, he was the CFO for African Gold Acquisition Corporation, of which he was a principal architect and for which he alone did most of the ground work. At the same time, he was newly committed to making time in his life for his marriage and planning a long-overdue wedding celebration with family and friends, and a honeymoon/ vacation. It was these confluences – exacerbated by alcohol abuse and gambling addiction – that led to his crime for which he now stands ready for punishment.

## II.    FACTS

### A.    Personal History and Education

Cooper Morgenthau, 36 years old, was born in Avon, Connecticut on March 1, 1987.  He is the youngest of three sons born to Gregory Steven Morgenthau and Darlene Anna Soucy.  Mr. Morgenthau was a management consultant, who often worked long hours, and Mrs. Soucy was an administrator.  They are no longer working.

Cooper has two older brothers: Justin (age 45) and Spencer (age 43).   Justin is a manufacturing executive who lives in South Windsor, Connecticut.  Spencer is a heating and air system sales representative who lives in Leesburg, Virginia.  Cooper also has a close sibling relationship with his sister-in-law, Nicole Lindstedt, who considers him a brother.

Cooper's childhood was tumultuous.  His father was an alcoholic, who was emotionally and verbally abusive towards him.  As a result, Cooper's parents divorced when he was eight years old.  This was not an amicable divorce and Cooper was often caught in the middle.  At the time, Cooper's older brothers were away at college, so Cooper had to manage the fallout of the divorce alone.

His father remarried but has since divorced his second wife.  His mother, Mrs. Soucy, remarried twice.  Her second husband of ten years, Bill Smith, died of a brain tumor.  She has since married Brian Soucy, a retired marine and currently a charter fishing boat captain in Florida.  Cooper has a close relationship with Mr. Soucy.

Cooper attended Avon High School.  Although his grades were not good, his high SAT score enabled him to get into Virginia Tech.  He graduated from Virginia Tech in 2010 with a bachelor in science degree in business with a major in finance.

### B. Business History

After obtaining his undergraduate degree, Cooper worked at various financial institutions as a financial analyst. In 2010, he moved to New York and worked for Citigroup as a financial analyst. From 2012 to 2013, he worked in that same analyst capacity with Chesapeake Partners, a hedge fund based in Baltimore. Cooper ultimately left Chesapeake Partners for a higher salary and a better opportunity with M. Klein and Company ("Klein"), a strategic advisory firm in New York. From 2013 to 2019, Cooper was a financial analyst at Klein, where he worked on billion-dollar deals and learned the details of special purpose acquisition company (SPAC) transactions and mergers and acquisitions. He learned much of his financial and management skills during this time, and developed an extensive and impressive list of professional contacts of business people, accountants and lawyers.

Based on his work at Klein, he was poached by the CEO of Clarivate Analytics, a data analytics company in Philadelphia. He served as the Senior Vice President of Clarivate Analytics in 2019.

In the summer of 2019, Cooper was instrumental in devising the business and business strategy for African Gold Acquisition Corporation (AGAC), a publicly-traded SPAC that focused on targets in the gold mining sector. He did the ground work for the company, including assembling the sponsor entity and members, putting together the business plan, finding investors, and working with lawyers and accountants to prepare SEC registration materials, as well as loaning his own personal funds to get the company up and running. In November 2019, Cooper began serving as the CFO for AGAC, and he alone set up the company's financial accounts with little oversight or assistance from the company board of directors and sponsor.

After AGAC had identified a target company and the merger transaction was underway, Cooper worked with some of the members of the AGAC sponsor to set up a separate company called Strategic Metals Acquisition Corporation (SMAC), a SPAC intended to focus on targets in the global strategic metals, mining and processing sector. He did the same extensive ground work for this company as he had for AGAC, including recruiting board members and marketing the company to investors. As with AGAC, Cooper used his own uncompensated labor and funds to institute the company, including arranging for incorporation formalities and opening SMAC financial accounts using his own banking relationships.

These companies and their investors were the victims of his criminal offense. His role with both companies terminated in August 2022, after his criminal conduct came to light.

In January 2023, Cooper moved to Fernandina Beach, Florida. Since February 2023, he has been working at Home Depot as an electrical associate. He was initially hired as a part-time employee but has since been promoted to a full-time employee. He also volunteers with Nassau Humane Society multiple days a month, taking care of and placing shelter animals.

### C. Family and Friendships

In October 2016, Cooper met his wife, Anetta Morgenthau, while they were both living in New York City. Cooper's mother described his relationship with Anetta as "the best thing that ever happened to him." (PSR ¶ 63.) Anetta is a corporate attorney at a New York law firm. The couple married in May 2019 at the Office of the City Clerk. They lived in Cooper's apartment in Manhattan until March 2020, when the COVID-19 pandemic led them to move into Anetta's parents' home in South Richmond Hill, New York. They rented out the bottom floor as a separate unit. Anetta and Cooper are currently separated. Cooper's drinking issues and long work hours had placed a strain on their marriage. In December 2022, after learning of his crime, Anetta filed

for divorce. Cooper, however, has maintained a close relationship with her and the couple is taking steps to try to reconcile and save the marriage, with the hope of starting a family soon.

Cooper has a very close relationship with his parents, brothers, stepfather and in-laws. They remain supportive of him through this difficult time. Since the separation, Cooper has been residing with his mother and stepfather in Fernandina Beach, Florida. Cooper and his older brothers, Justin and Spencer, speak every week.

### D. Mental Health, Substance Abuse and Gambling

Cooper has suffered from ADHD all of his life. He struggled with grades in high school and college until his sophomore year of college, when he was prescribed Adderall by his primary care physician. Although this was a game-changer for Cooper's grades in the short term, its long-term effects were destructive. Beginning at age 20, Cooper abused Adderall on a daily basis, regularly taking more than his prescribed dosage.

He also struggled with alcohol addiction for many years. Starting at age 16, he drank alcohol on a near daily basis. Beginning at age 24, his drinking became less social and occurred more often when he was alone. Cooper was a functioning alcoholic. His Adderall usage counteracted the lethargic effects of drinking, allowing Cooper to keep up with his work demands while consuming alcohol daily. Like many addicts, Cooper worked hard to keep his addictions hidden from those around him.

Cooper has a history of gambling, which has resulted in his losing large sums of money at once. In 2016, he lost $50,000 on a single wage in a sports bet. Securities and crypto trading held the same attraction for him as gambling and triggered the same fascination. He has for years had trading accounts and crypto accounts in his own name. He used to trade with these accounts with the same heedless compulsion as he had when engaging in traditional forms of gambling.

Although Cooper's substance abuse and gambling issues consumed his life for many years, he has been trying to overcome them and has been seeking treatment. The pandemic lockdown and resulting isolation and stress, including increased uncertainty in his business and financial affairs caused by the unprecedented and historic pandemic hit to the world economy, exacerbated his condition. He was cut off from routine travel and the social events and get-togethers with family, friends and business mentors and colleagues, which, in normal times, were crucial to his health (as was true for so many of us). From September to November 2020, Cooper checked himself into New Dawn Rehab facility in Orangevale, California, seeking help for his alcohol abuse. He was diagnosed with situational anxiety and depression. As part of his treatment, Cooper attended regular counseling sessions and participated in Alcoholics Anonymous meetings daily.

In late 2022, however, Cooper relapsed from his sobriety. As a result, he experienced suicidal ideations and was committed to the psychiatric ward of Natchaug Hospital, in Connecticut, for eight days. He was diagnosed with a substance induced mood disorder. This hospitalization, and other stark realities, prompted Cooper to realize in a more profound way than he had previously the negative effects that Adderall and alcohol have had on his life.

Since January 2023, upon relocating to Florida, Cooper has been attending Starting Point Rehab. He is enrolled in an intensive outpatient program that addresses his substance abuse and mental health issues. Gambling is currently a point of emphasis in his treatment sessions. He has attended at least one AA meeting each day for the entirety of 2023 (to date).

### E. The Offense

As noted above, Cooper was the chief financial officer for both AGAC and SMAC, and he alone, with minimal oversight, was in charge of both companies' financial affairs and accounts. His business partners and investors – many of whom were close friends and immediate family

members – trusted him in this role, especially because Cooper was so heavily personally invested in, and a driving force behind the design and operation of, both companies and he had a proven track record of great success with SPAC deals and businesses. He had, for example, used his own personal funds and vast amounts of uncompensated time and effort in establishing both companies and shepherding AGAC through acquisition of its target company.

As noted above, in June 2021, he unlawfully transferred $20,000 from the AGAC account to himself personally to cover a shortfall he had in cash for some deposits needed for his upcoming wedding celebration. In trying to replace the money a few months later, he unlawfully transferred yet more company funds to his personal E-Trade brokerage account with the intent to use gains from day-trading with this money to replace the stolen funds in their entirety. This backfired. Within just a matter of weeks, he had taken – and lost – over $1 million in company funds over the course of dozens of transfers and vain attempts to trade his way out of the ever-deepening financial hole.

He used deception and false accounting to conceal what he did. He deceived the AGAC accountants and outside auditor leading to the filing of false SEC quarterly reports for the company.

The stress of these circumstances – for which he alone is to blame, as he fully accepts – exacerbated his mental and emotional health, leading to more desperate attempts to find ways to raise money to fund his day-trading in order to earn enough through trading to fix what he had done. He turned to investors for SMAC. Using false pretenses, he convinced multiple victims, including close friends and family, to give him money ostensibly as investments in SMAC that in actuality Cooper used to continue his day-trading efforts to earn sufficient funds to make everyone whole. This frantic effort lasted months and led to another $4 million in losses.

The debacle ended in early August 2022.  By then, Cooper had lost all of the money he had taken.  Every effort he made to recoup the losses led to more catastrophic losses to the companies and their investors – the very people who are center-most to Cooper's career, his business and his personal life, the very people he cared for the most.  The damage he did far exceeded economic harm to corporate business entities and investors.  He ended up financially hurting people he worked closely with and depended on; he destroyed his career along with friendships and business relationships that took him well over a decade to build; and he grievously hurt his loved ones, both financially and in deeper, more profound ways.  He fully acknowledges the pain and loss that he caused; he has visited that same pain on himself many fold.

### F.      Self-Report and Full Cooperation

Cooper's downward spiral collided with stark reality by July and August 2022, when AGAC directors started to confront him with unpaid company bills and unexplained debits in the company's bank account.  While the board of directors immediately reported the matter to the SEC, Cooper sought out counsel to assist him in navigating the legal fallout of his actions.  With the assistance of counsel, he immediately and proactively offered to cooperate fully with the authorities, first the SEC and later the U.S. Attorney's Office.

He met with the SEC attorneys and federal prosecutors and provided full details of all his unlawful conduct, turning over his emails, texts, financial records and anything else requested.  He was fully cooperative and met with the authorities virtually and in person as often as requested.  In fully cooperating, he repeatedly declared his intention to make full restitution to the people he hurt financially and to assist the government in any way in recouping funds.

He has thus taken full responsibility for his conduct and undertook the first steps to begin to redress the harm he caused.  He did so, moreover, as soon as he got the help he needed to face

the reality that he had been blind to as a result of the pressures and the human frailty that plagued him personally, as recounted above.

Although he is now impecunious, he has the drive, intelligence, creativity and experience to regain his status as a productive member of society and, because he is still young, he will with time earn his way to being able to repay the debt he owes, both to his victims and to society.

## III.    SENTENCING

### A.    Guidelines Calculation

Cooper does not dispute the sentencing-guideline calculation set forth in the Pre-Sentencing Report and likewise agrees with the suggestion of U.S. Probation (PSR ¶ 114) that a downward variance and "non-guideline sentence" are appropriate.

The calculated Guideline range is 87 to 107 months – between 7 and 9 years.  Even Probation, which recommended a 51-month sentence, concluded that is excessive.  Both the Guideline range and Probation's recommendation do not reflect the realities of and are disproportionate to the crime and circumstances here.  Nor do they take into account the unprecedented and historic pandemic and resulting economic stress, isolation and social "lockdown" that wreaked havoc on all of us in so many unpredictable and difficult ways.

Under the Guidelines, the base level offense is 7, increased by 18 levels because the loss was between $3,500,000 and $9,500,000, two additional levels for the number of victims, and an additional four levels because the offense involved a violation of securities law and Cooper was an officer of publicly traded companies.  This is offset by a three-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a), (b), yielding the adjusted offense level of 28.  Cooper has two prior criminal misdemeanor convictions for DWI (one was ten years ago in 2013 and the other 2017) – a past manifestation of his alcoholism.  Even though these are low-level offenses that did

not entail incarceration and one is very old (when Cooper was in his twenties), these offenses require a category II criminal history. That categorization adjustment fails to reflect the reality of these years-old, alcohol-related and low-level prior offenses.

### B. Cooper Morgenthau Should Receive a Non-Custodial Sentence

The Sentencing Guidelines are advisory and merely one factor to consider in determining an appropriate sentence. *See Gall v. United States*, 552 U.S. 38 (2007); *Nelson v. United States,* 555 U.S. 350, 352 ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable."). Moreover, courts may take into account the fact that the effect of a rote application of the Guidelines leads, as it does in this case, to an unfair "piling on," cumulative effect that overstates the severity of the crime. There is a significant overlap between the enhancement for the number of victims and the loss amount: that results in a double-count of the size of the offense. As the Guidelines recognize, "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1, Application Note 21(C).

The courts have uniformly held that downward departure is warranted in these circumstances. *See United States v. Johnson*, No. 16-CR-457-1, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (refusing to apply a 16-level loss enhancement because "the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime" and because the loss enhancement is "fundamentally flawed, especially as loss amounts climb"); *United States v. Lauersen*, 362 F.2d 160, 164 (2d Cir. 2004), *vacated and remanded on other grounds in light of United States v. Booker*, 543 U.S. 1097 (2005); *United States v. Abiodun*, 536 F.3d 162, 166, 170 (2d Cir. 2008); *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y.

2006) (noting "piling on" of guideline points). *See generally United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (in a securities-fraud prosecution noting the "piling on" of points "for which the guidelines have frequently been criticized"). The "Sentencing Guidelines for white-collar crimes should [not] be a black stain on common sense." *Id.* at 754.

The Court must also consider each of the Section 3553(a) factors. The "weight to be afforded" each factor is "a matter firmly committed to the discretion of the sentencing judge." *United States v. Jennings*, 743 F. App'x 474, 478 (2d Cir. 2018). In doing so, the Court – taking into account all of the mitigating circumstances in this case – must arrive at a sentence that is "sufficient, but not greater than necessary, to comply with the purposes of" sentencing. 18 U.S.C. § 3553(a); *Gall*, 552 U.S. at 50 n.6. There is no requirement that there be "'extraordinary' circumstances to justify a sentence outside the Guidelines range." *Id.* at 47.

Also, "the Guidelines disallowance of the option of probation is, of course merely advisory." *United States v. Kononchuk*, 485 F.3d 199, 205 (3d Cir. 2007). "[T]hus the range of choice dictated by the facts of the case is significantly broadened" from the Guidelines, and federal courts have the power to order non-custodial sentences. *Gall*, 552 U.S. at 59-60 (reversing appellate court reversal of sentence of probation where Guidelines would have precluded non-custodial sentence).

Analysis of these factors demonstrates that a non-custodial sentence would be entirely in keeping with that statutory command.

> 1.    Nature and Circumstances of the Offence and History and
>        Characteristics of the Defendant

Cooper is, by all accounts, a good person. To be sure, he committed a serious criminal offence, for which he promptly and fully accepted responsibility and fully agrees deserves punishment. But the offense is aberrational. Just punishment needs to account for both the full

circumstances of his offense as well as the penalties already imposed on him and his work to make restitution, both morally and economically.

Moreover, despite his youth, he has a proven track record of being a hardworking productive member of society and a family man, dedicated to and close with his siblings, his parents, his step-father and to his wife and her family. Cooper's father once remarked that his son is "the sort of guy who would journey to the ends of the earth to protect and help make everyone in his life happy." Ex. A (Letter of Anetta Morgenthau). Cooper's mother notes that he "is a kind, generous and loving son who has always been supportive of me, especially through some of the more trying times in my life." Ex. B (Letter of Darlene Smith). His wife, Anetta, observes: "Cooper has always wholeheartedly and thoughtfully taken great care of me." She recalls that throughout the couple's emotionally and physically draining process of trying to conceive both naturally and through in vitro fertilization, Cooper "insisted" on going to her doctor's appointments and "was there with a hug for every disappointing setback and for each victory, no matter how small, reminding [her] to remain hopeful." Ex. A (Letter of Anetta Morgenthau). He does not have the kind of record deserving of the kind of severe punishment needed to break a standing pattern of outlaw activity or repeated and dangerous disregard for the rights and property of others.

While Cooper accepts full responsibility and just punishment, the magnitude of his crime just does not compare, by any reasonable, objective measure, to the frauds that have resulted in well-deserved multi-year prison sentences. Here, the crime at root resulted from Cooper's desire to repair the harm caused by his momentary lapse in paying himself ahead of what he had earned to fulfill a promise to his wife to have a suitable long-delayed wedding celebration fast on the heels of the debilitating pandemic lockdown; he was, ironically and tragically, trying to repay what he

took when he succumbed to the "magical-thinking" fueled by his addictions that he could make everyone whole through his day-trading. He was in a very real sense delusional, *i.e.*, not thinking straight or in his right mind. This is not a crime where deceit was calculatingly used with cunning and utter disregard for others purely for self-enrichment or aggrandizement. *Cf. United States v. Parris*, 573 F. Supp. 2d at 754 ("fairness in sentencing required that [the Court] recognize that, although the [defendants'] criminal conduct was reprehensible, they were simply not in the same league as" other frauds warranting severe sentences).

2.      Need for the Sentence Imposed to Reflect the Seriousness
of the Offense, Promote Respect for the Law, Provide Just
<u>Punishment, and Adequately Deter Criminal Conduct</u>

A variance from the Sentencing Guidelines in this case in no way undercuts society's interest in promoting respect for the law and deterring future criminal conduct. Cooper's addictions and actions have already had severe repercussions for him: he lost his career, the entirety of his wealth, and his home, and jeopardized his marriage.

He has also been penalized by the SEC, which, in a parallel civil action and with Cooper's full cooperation, obtained a consent judgment against him permanently barring him from serving as an officer or director of a publicly traded company. *SEC v. Cooper J. Morgenthau*, No. 23-CV-00022, Dkt. No. 4 (S.D.N.Y. 2023). *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (affirming a 20-month sentence despite a Guidelines range of 78 to 97 months where "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant"); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (affirming downward variance based on "other ways in which the defendant had suffered atypical punishment such as . . . the ongoing case against him from the Securities and Exchange Commission"); *United States v. Redemann*, 295 F. Supp. 2d 887, 895 (E.D. Wis. 2003)

(granting downward departure where defendant "was barred by order of . . . the Federal Reserve from participating in any capacity in a federally-insured financial institution").

Moreover, incarceration would have the perverse effect of imposing exactly the kind of social isolation and "lockdown" that exacerbated his emotional and mental health to begin with. It would also, as his wife noted, potentially interrupt and damage his therapeutic work to overcome his afflictions and make financial restitution to all his victims:

> Cooper is currently committed to and benefitting greatly from a rigorous treatment program for his addiction disorders – a positive course of action from which he would surely be negatively detoured were he to be forced behind bars.
>
> Cooper also vows to make monetary restitution to the victims of the one and only, albeit considerable, white-collar crime of his life. To do so as expeditiously as possible, however, he must retain the ability to work a decent-paying job, which would be entirely impossible from prison.

Ex. A (Letter of Anetta Morgenthau).

In any case, even without a prison term, his felony conviction will create difficult life-long obstacles for him in reforging a professional career and business. There can be no doubt that the "lesson" was seared into him and that he fully appreciates the harm his crime wrecked upon others as well as on himself and his future.

Moreover, as recognized by the United States Supreme Court in *Gall*, while custodial sentences are more severe, "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty," including regularly reporting to a probation officer, unannounced visits to the home, mandatory disclosure of financial information, *etc*. *Gall*, 552 U.S. at 48-49. With such a sentence in this case, no objective observer would conclude that Cooper has not "paid" for his crime and debt to society.

3.         Need for the Sentence Imposed to Protect the Public from
<u>Further Crimes of the Defendant</u>

As is clear from the U.S. Probation report and the undisputed facts of this case, Cooper has not acted dangerously or with malice or in disregard of others. He poses no danger to the public. Given his relatively minor criminal history, the aberrational nature of his crime, and his strong family ties, there is no rational basis to believe he would commit any future crime. Aside from his drinking offenses, this is his first and only instance of criminal conduct. His lack of substantial contact with the criminal justice system prior to this case and his expression of remorse through his deeds demonstrate he is not a danger to society. *See United States v. Oldani*, No. 09-CR-00010, 2009 WL 1770116, at *7 (S.D.W. Va. June 16, 2009) ("Based on his status as a true first offender, there is little likelihood that [the defendant] will be brought before the criminal justice system in the future."). It is therefore compellingly clear that a substantial variance for Cooper would not risk public safety.

4.         <u>Available Sentences</u>

Cooper Morgenthau is eligible for probation by statute because he did not commit a Class A or Class B felony. 18 U.S.C. §§ 3559(a), 3561(a). Moreover, given that the Sentencing Guidelines are advisory, those guidelines do not prevent the Court from imposing the sentence it considers most appropriate, including a noncustodial sentence. *Gall*, 552 U.S. at 59-60.

5.         Need to Avoid Unwarranted Sentence Disparities Among
Defendants With Similar Records Who Have Been Found
<u>Guilty of Similar Conduct</u>

A significant downward variance from the Guidelines is most in line with other comparable cases, previously before this Court, where the defendant pleaded guilty to a crime involving wire fraud. *See, e.g., United States v. Shea*, No. 15-CR-00546 (S.D.N.Y. 2016) (sentencing defendant

to 18 months instead of the 33-to-41-month guideline range); *United States v. Nissen*, No. 17-CR-00477 (S.D.N.Y. 2019) (27 months instead of 97 to 121 months).

Thus, in light of the unique circumstances here, a downward departure to a sentence of probation is in keeping with other cases. *See, e.g., United States v. Kelley*, No. 16-CR-00837 (S.D.N.Y. 2017) (imposing probation instead of a Guidelines sentence of 97 to 121 months, crediting defendant for confessing wrongdoing and pleading guilty); *United States v. Schuster*, No. 01-CR-67, 2002 WL 31098493, at *1 (S.D.N.Y. 2002) (sentence of probation where the defendant who pled guilty to securities fraud had been severely punished in part due to disbarment); *United States v. Schulman*, No. 16-CR-442 (E.D.N.Y. 2017) (reducing a sentence for insider trading from a Guidelines range of 41 to 51 months to probation upon concluding that "the significant collateral effects" of the conviction achieved the goal of deterrence); *United States v. Shamilzadeh*, No. 04-CR-1094 (E.D.N.Y. 2008) (imposing probation where the defendant pled guilty to conspiracy to defraud financial institutions of over $146 million); *United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (affirming probation and home confinement for wire fraud where offense was "isolated mistake" in upstanding life); *United States v. Warner*, No. 13-CR-731 (N.D. Ill. 2014), *aff'd*, 792 F.3d 847 (7th Cir. 2015) (imposing probation where the defendant had already suffered "humiliation and reproachment," and "society will be best served by allowing him to continue his good works").

## 6. Need to Provide Just Restitution

"[T]he need to provide restitution to any victims of the offense" is a factor that must be considered by the Court in imposing a sentence. 18 U.S.C. § 3553(a)(7). Cooper Morgenthau is a productive, hard-working member of society who has been working and will continue to work to provide restitution. A noncustodial sentence is the best option in these circumstances for the

victims: It would provide the longest time for him to work and earn the millions needed for restitution, while still sufficiently punishing him. *See Adelson*, 441 F. Supp. 2d at 514 ("an important kind of retribution may be achieved through the imposition of financial burdens").

## IV.  CONCLUSION

We respectfully submit that, upon consideration of all of the Section 3553(a) factors, a noncustodial sentence of probation is the most just sentence in this case (or, alternatively, a sentence substantially below the Sentencing Guidelines that includes home detention). It is sufficient, and not greater than necessary, to meet the purposes of sentencing.

Dated:   New York, New York
                April 13, 2023

Respectfully submitted,

/s/ *Michael Paul Bowen*
Michael Paul Bowen
Naznen Rahman
GLENN AGRE BERGMAN & FUENTES LLP
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
(212) 970-1600
mbowen@glennagre.com
nrahman@glennagre.com

*Counsel for Cooper Morgenthau*